American Whitewater; American Canoe )
Association; Georgia Canoeing Association; )
Atlanta Whitewater Club; Foothills Paddling )
Club; Western Carolina Paddlers; Joseph C. )   C.A. No. 8:09-cv-02665-JMC
Stubbs; Kenneth L. Strickland; and Bruce A. )
Hare, )
 )
 )
        Plaintiffs, )
 )
        v. )
 )   **OPINION AND ORDER**
Thomas Tidwell, in his official capacity as )
Chief of the United States Forest Service; the )
United States Forest Service, an agency of the )
United States Department of Agriculture; )
Elizabeth Agpaoa, Regional Forester, )
Southern Region, United States Forest )
Service; Monica J. Schwalbach, Acting Forest )
Supervisor, Francis Marion and Sumter )
National Forests; Marisue Hilliard, Forest )
Supervisor, National Forests in North )
Carolina; George M. Bain, Forest Supervisor, )
Chattahoochee-Oconee National Forests; )
Thomas Vilsack, in his official capacity as )
Secretary of the United States Department of )
Agriculture; and the United States Department of )
Agriculture, )
 )
        Defendants, )
 )
        and )
 )
Richard Rust; Philip Rust; Henry Rust; )
and the Whiteside Cove Association, )
 )
        Intervenors. )
_____ )

Plaintiffs American Whitewater ("AW"), American Canoe Association, Georgia Canoeing Association, Atlanta Whitewater Club, Foothills Paddling Club, Western Carolina Paddlers, Joseph C. Stubbs, Kenneth L. Strickland, and Bruce A. Hare ("Hare") (collectively "Plaintiffs") bring this action alleging that the United States Department of Agriculture ("USDA"), through its agency, the United States Forest Service ("USFS") (collectively with the named agency defendants and named individual defendants in their official capacity "Defendants"), unlawfully infringed upon Plaintiffs' right to use and enjoy the Chattooga River (the "Chattooga") upstream of South Carolina Highway 28 (the "Headwaters" or "Upper Chattooga") through hand-powered floating.[1]  Now before the court are Plaintiffs' Motion for Preliminary Injunction [Doc. # 15], Plaintiffs' related Motion for Reconsideration of Temporary Restraining Order [Doc. # 35], Defendants' Motion to Dismiss [Doc. # 44], the Rust Family and Whiteside Cove Association's ("Intervenors") Amended Motion to Dismiss [Doc. # 69], and Motion by Government Defendants to Exclude Some of the Plaintiffs' Proposed Exhibits and Witnesses [Doc. # 84].

## FACTUAL AND PROCEDURAL HISTORY

The Chattooga River is a natural waterway originating in western North Carolina and flowing south to form the border of northwestern South Carolina and northeastern Georgia.  Only those remote and northernmost twenty-one miles of the Chattooga above South Carolina Highway 28 are at issue in this case.

---

[1]The terms "floating" and "boating" are used herein to describe water activities such as canoeing, kayaking, whitewater rafting, or other similar paddling activities.  Floaters or boaters are used to describe those who engage in these activities.

In 1974, Congress designated the entire Chattooga as a "Wild and Scenic River" under the Wild and Scenic Rivers Act ("WSRA" or "Act").[2]   Under this designation, the river was and is protected as a valuable natural resource to be preserved for present and future use.  *See* 16 U.S.C. § 1271.   Under the WSRA, the USDA was placed in charge of managing the Chattooga in compliance with the Act, *see* 16 U.S.C. § 1281(d), and the USDA primarily executed its management responsibilities through the USFS.   In 1976, the USFS instituted the 1976 Chattooga Wild & Scenic River Classifications, Boundaries and Development Plan (the "1976 Plan") to manage the use of the resources available at and around the Chattooga.   In 1978, the USFS promulgated final regulations which prohibited all private and commercial floating on the entire Chattooga River without a permit.  36 C.F.R. 261.77 (2010).   The summary of the agency action provided that permits would "include conditions of use to protect river values and provide for floater safety."  *See* 43 Fed. Reg. 3706 (Jan. 27, 1978).   While safety was noted as a concern, the agency provided no detailed purpose for enacting this prohibition.   Although the regulation prohibited floating on the entire Chattooga, the USFS permitted floating on the lower portion of the Chattooga River below South Carolina Highway 28.   There was allegedly no posting regarding the ban on or near the Chattooga Headwaters and floaters continued to use this portion of the river for floating activitites.   However, the USFS did not permit floating on the Headwaters and noted this continued prohibition under a new management plan in 1985, the Sumter National Forest Land and Resource Management Plan (the "1985 Plan").

_____

[2]In 1968, Congress enacted the Wild and Scenic Rivers Act to preserve certain rivers of the United States which "possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values." 16 U.S.C. §§ 1271-1287 (2009).

.

Plaintiffs claim that floaters did not learn of the prohibition until several years after the institution of the 1985 Plan, and it was at this time that interested parties allegedly began efforts to lift the ban. As a result of an official challenge in 2003, the USFS agreed to analyze the reasons for disallowing floating on the Headwaters under the various plans. Unfortunately, in the 2004 Revised Sumter National Forest Land and Resource Management Plan (the "2004 Plan") issued by the Regional Forester, the USFS determined that the floating prohibition was warranted without substantial analysis or explanation. In April 2004, AW filed an administrative appeal of the 2004 Plan. The USFS Reviewing Officer of the Chief of the Forest Service ("Reviewing Officer") reversed the Regional Forester's decision to continue the floating ban on the Headwaters. In her decision, the Reviewing Officer stated:

> I find the Regional Forester does not provide an adequate basis for continuing the ban on boating above Highway 28. Because the record provided to me does not contain the evidence to continue the boating ban, his decision is not consistent with the direction in Section 10(a) of the WSRA or Sections 2(a) and 4(b) of the Wilderness Act or agency regulations implementing these Acts.

(Decision for Appeal of the Sumter National Forest Land and Resource Management Plan Revision, at 6 (April 2004)). The Reviewing Officer further directed the Regional Forester to conduct a visitor use capacity analysis of the Headwaters and to adjust or amend the 2004 Plan based on the findings. The Reviewing Officer estimated that the analysis would be completed in approximately two years. Because the Reviewing Officer reversed the section of the 2004 Plan concerning the floating ban, she also provided for an interim management direction reverting back to the 1985 Plan for the management of floating on the Headwaters. This interim management direction effectively continued the floating prohibition.

In May 2006, AW filed suit in the United States District Court for the Northern District of Georgia challenging the Reviewing Officer's decision to revert to the 1985 Plan for the interim management of the Headwaters.[3] AW requested the court to set aside the Reviewing Officer's 2005 decision perpetuating the ban until the USFS issued an amendment to the 2004 Plan. *American Whitewater, et al v. Bosworth, et al*, C.A. No. 2:06-cv-00074-WCO (N.D. Ga. Oct. 6, 2006). AW argued that the Reviewing Officer's interim management decision was arbitrary and capricious in that it directly conflicted with her analysis that the incorporation of the ban in the 2004 Plan was inadequately supported. *Id*.

The court declined to grant AW the relief it sought on the grounds that it lacked standing because the alleged injury - the prohibition against floating on the Headwaters - was not traceable to the Reviewing Officer's 2005 decision, but was derived from the 1985 Plan. The court also found that the issue was not ripe for review. In discussing the ripeness of the Reviewing Officer's decision, the court stated:

> Despite the order's last sentence [stating that the decision was final and appealable], the court agrees with defendants on this issue. While the order setting aside the 2004 plan constitutes final agency action, the decision to *temporarily* revert to the 1985 plan while an amended plan is developed is just that, temporary. . . . Whether that amended plan renews or lifts the floating ban, the question of floating on the Headwaters will be definitively resolved by final agency action and subject to judicial review at that more appropriate time.

*Id*. at 12-13. While the court found that AW's suit was not ripe, the court noted that AW only challenged the interim floating ban and not the 1985 Plan. The court also noted that any hardship experienced by AW would last for only a short period while the USFS amended the 2004 Plan and

---

[3]The Chattooga River also flows through Georgia. Therefore, the United States District Court for the Northern District of Georgia had jurisdiction to hear the matter and the suit was filed in Georgia for the convenience of counsel at that time.

that the affected parties, by order of the Reviewing Officer, would be involved in the visitor use capacity analysis. *Id*. at 17-18.

In August 2009, the USFS issued the 2009 Amendments to the 2004 Plan which allowed very limited floating on the Headwaters from December 1 through March 1 only when river flow levels reach approximately 450 cubic feet per second or higher. Plaintiffs filed the instant action in October 2009, and sought a temporary restraining order ("TRO") and preliminary injunction to require the USFS to entirely lift any and all prohibition against floating on the Headwaters. In addition to alleging a violation of the WSRA, Plaintiffs also allege in their Complaint that Defendants' actions violate the Wilderness Act, the Multiple-Use Sustained-Yield Act, the Forest and Rangeland Renewable Resources Planning Act, the National Forest Management Act and its implementing regulations, the Administrative Procedures Act ("APA"), and the National Environmental Policy Act and its implementing regulations.

This court heard Plaintiffs' motion for TRO and denied that motion, in part, on the basis that court intervention was not necessary because the 2009 Amendments allowed at least some access to floating on the Headwaters. The court granted the TRO to the extent it allowed Plaintiffs to proceed with the administrative appeals process without waiving any rights to proceed with judicial review.

Several entities brought administrative appeals challenging the 2009 Amendments, including Plaintiffs. Approximately one week after the court's decision on the TRO, Defendants issued a stay of the 2009 Amendments based on a request from a third party. Consequently, floating on the Headwaters was effectively completely banned again. Plaintiffs promptly filed a motion for reconsideration of the TRO based on Defendants' stay of the implementation of the 2009

Amendments.

In December 2009, the USFS withdrew its decision notices concerning the 2009 Amendments and indicated that it planned to conduct further analysis before issuing new amendments to the 2004 Plan. According to the USFS, the discovery of inconsistencies in the decision documents prompted the withdrawal. As a consequence, on that same date, the Deputy Regional Forester and Appeal Reviewing Officer dismissed the five pending appeals based on the withdrawal of the decision notices.

Defendants filed a motion with the court to dismiss Plaintiffs' claims for lack of jurisdiction on the grounds that the action is moot and because Plaintiffs have failed to exhaust administrative remedies. The Rust Family and the Whiteside Cove Association, private land owners whose land is adjacent to the Chattooga River, moved to intervene and dismiss Plaintiffs' action on similar grounds.

### DISCUSSION

### I.    Defendants' Motion to Dismiss

Defendants seek to dismiss Plaintiffs' action pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction. Defendants contend that Plaintiffs' claims for relief from the 2009 Amendments became moot once the USFS withdrew the decision notices concerning the amendments. Defendants further argue that, even if Plaintiffs' claims are not moot, Plaintiffs have failed to exhaust administrative remedies as required by statute. Therefore, any judicial action is not yet ripe.

"When a Rule 12(b)(1) motion challenge is raised to the factual basis for subject matter jurisdiction, the burden of proving subject matter jurisdiction is on the plaintiff." *Richmond,*

*Fredericksburg & Potomac Railroad Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) (internal citations omitted). The court should consider the allegations contained in the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment. *Id.* In determining whether jurisdiction exists, the court should apply the standard applicable to a motion for summary judgment, under which the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists. *Id.* The moving party should prevail only if there is no dispute of material jurisdictional facts and the moving party is entitled to prevail as a matter of law. *Id.*

## A. Mootness

The court's exercise of its power of judicial review depends on the existence of a case or controversy. *Preiser v. Newkirk*, 422 U.S. 395 (1975). "A case becomes moot whenever it loses its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract propositions of law." *Cantrell v. City of Long Beach*, 241 F.3d 674, 678 (9th Cir. 2001) (internal citations omitted). Stated otherwise, a case becomes moot once the parties no longer maintain a legally cognizable interest in the outcome. *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (internal citations omitted).

There are two exceptions to mootness: challenges to conduct "capable of repetition yet evading review" and "voluntary cessation of the allegedly unlawful conduct." *Los Angeles v. Lyons*, 449 U.S. 934, 935 n. 1 (1980). If one of the exceptions to mootness applies, then the central inquiry becomes whether the court can render any effective relief. *Cantrell v. City of Long Beach*, 241 F.3d 674, 678 (9th Cir. 2001); *see also Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1065

(9th Cir. 2002) (only if effective relief is still available to counteract the effects of the alleged violation is the controversy live and present).

The first mootness exception applies where (1) the duration of the challenged action is too short to allow full litigation before it ceases, and (2) there is a reasonable expectation that the plaintiffs will be subjected to the same action again. *See Weinstein v. Bradford*, 423 U.S. 147, 149 (1975). "[T]he 'capable of repetition' exception requires a 'reasonable expectation' or a 'demonstrated probability' that 'the same controversy will recur involving the same complaining party.' [Supreme Court] cases find the same controversy sufficiently likely to recur when a party has a reasonable expectation that it 'will again be subjected to the alleged illegality,' or 'will be subject to the threat of prosecution' under the challenged law.'" *Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 463 (2007) (internal citations omitted).

The second exception to the mootness doctrine occurs when there is a voluntary cessation of the allegedly unlawful activity. Under this exception, a defendant carries the heavy burden to demonstrate there is no reasonable expectation that the allegedly wrongful behavior will recur. *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv.*, 528 U.S. 167, 189 (2000); *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979). A party asserting mootness may also meet its burden by establishing that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Davis*, 440 U.S. at 631; *see also Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1274 (9th Cir. 1998). Courts are prudent in granting dismissals in the context where the plaintiff could be exposed to the substantial risk of having to run to court repeatedly, only to be stymied each time as the defendant voluntarily, but temporarily, ceases its actions. *See Laidlaw*, 528 U.S. at 189.

The court applies the voluntary cessation exception in this case. In their memorandum, Defendants state that the "amendments have been withdrawn in order to complete additional analyses and make new decisions. When future forest plan amendments are reissued (which they will be), whatever provisions they contain will be based on revised analyses and will constitute entirely new decisions." Def. Mem. in Supp. of Mot. to Dismiss, at 9. However, Defendants' counsel recognized at the hearing on the motion that the decisions were withdrawn to correct inconsistencies within the decisions, and it was likely that the USFS would issue new decisions continuing at least a partial ban against floating on the Headwaters. Defendants also have a long history of enacting decisions which prohibit or place stringent limitations against floating on the Headwaters. *See supra*, 1976 Plan *and* 1984 Plan. Plaintiffs challenge not only the limited floating allowed by the 2009 Amendments, but the broader ability of Defendants to place *any* limitation against floating on the Headwaters.

"Courts are understandably reluctant to permit agencies to avoid judicial review, whenever they choose, simply by withdrawing the challenged rule." *Dow Chemical Co. v. Envtl. Prot. Agency*, 605 F.2d 673, 678 (3rd Cir.1979). "Where a court is asked to adjudicate the legality of an agency order, it is not compelled to dismiss the case as moot whenever the order expires or is withdrawn." *Nader v. Volpe*, 475 F.2d 916, 917 (D.C. Cir. 1973) (quoting *Southern Pacific Terminal Co. v. Interstate Commerce Comm'n*, 219 U.S. 498 (1911)). Furthermore, when an agency withdraws an order while maintaining that the legal position of the order remains justified or is likely to be reinstated, repetition is likely, and the claim should not be considered moot. *See Doe v. Harris*, 696 F.2d 109, 113 (D.C. Cir. 1982).

Based on the agency history combined with the indication that the agency's decision would probably not deviate dramatically from its previous stance on the issue, there is a "reasonable expectation" that the same controversy or allegedly wrongful behavior will recur and potentially escape review by this court due to continuous revisions. Therefore, Plaintiffs' claims are not moot simply because the decision notices have been withdrawn.

### B. Exhaustion of Remedies

Defendants argue that dismissal is also appropriate because Plaintiffs are required to exhaust administrative remedies prior to seeking relief from this court. Defendants essentially contend that the 2009 Amendments were not final agency decisions subject to review; and therefore, Plaintiffs must wait until all agency level appeals of the 2009 Amendments (or now, their forthcoming replacements) are completed before requesting judicial review in accordance with agency regulations.

The APA authorizes judicial review of a final agency action for which there is no other adequate remedy in court. *See* 5 U.S.C. § 704 (2009). Although section 10(c) of the APA only permits review of agency actions that are "final," any definitive agency decision is considered "final," and therefore reviewable, unless the agency's regulations require exhaustion as a prerequisite to judicial review. *See Darby v. Cisneros*, 509 U.S. 137, 153 (1993). Agency regulations explicitly require exhaustion as a prerequisite to judicial review. 36 C.F.R. § 215.21 ("any filing for Federal judicial review of a decision subject to appeal is premature and inappropriate unless the plaintiff has first sought to invoke and exhaust the appeal procedures in this part (7 U.S.C. 6912(e)").

Agency action may be "final" upon the satisfaction of two conditions: (1) the action must mark the consummation of the agency's decision making process – it must not be merely tentative

or interlocutory in nature; and (2) the action must be one by which "rights or obligations have been determined" or from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). In determining whether an agency action is final, a court should consider: (1) whether the agency's position is definitive; (2) if the agency's actions affect the plaintiff's day-to-day activities; (3) whether judicial relief is likely to interfere with the proper functioning of the agency and would be a burden to the courts; (4) whether judicial intervention would deny the agency an opportunity to correct its own mistakes and to apply its expertise; and (5) whether judicial intervention would lead to piecemeal review which is inefficient and possibly unnecessary. *F.T.C. v. Standard Oil Co. of California*, 449 U.S. 232, 239-242 (1980).

While an amendment to an agency regulation or decision may not always meet the requirements of a final agency decision, the 2009 Amendments issued by the USFS do. They qualify as the consummation of the agency's decision making process in this case and they definitively set forth the rights of boaters to float on the Headwaters. Here, Plaintiffs' legal challenge to Defendants' limitations against floating on the Headwaters began with the administrative appeal of the 2004 Plan. They were successful in their efforts to demonstrate that the agency's decision to continue the prohibition against floating was arbitrary and capricious. However, their success was a hollow victory which resulted in the agency's temporary reversion to the 1985 Plan which also contained a prohibition against floating the Headwaters. Plaintiffs sought judicial review of the Reviewing Officer's decision. At that time, Plaintiffs challenged only the 2005 Decision on Appeal determination to temporarily revert to the 1985 Plan for the interim management of the Headwaters pending issuance of an amendment to the 2004 Plan. The 2009 Amendments were issued in August

2009 and set forth the revised parameters for floating on the Headwaters based on the agency's analysis of various information.

The instant situation is distinctly different from the posture of the case before the District Court for the Northern District of Georgia. That court found that Plaintiffs' suit was premature given the temporary nature of the Decision on Appeal and the availability of judicial review after issuance of the agency decision revising the 2004 Plan. No appeals were taken from that court's order. The 2009 Amendments were issued and, as the United States District Court for the Northern District of Georgia instructed, Plaintiffs sought judicial review. The 2009 Amendments were not temporary, tentative, or interlocutory in nature. In fact, they were the complete opposite - actions intended to be permanent resolutions to the matter first appealed in 2004 and actions that would likely be in place now but for the agency's withdrawal of the decision notices. Consequently, the 2009 Amendments are final agency decisions susceptible of judicial review. However, even assuming exhaustion of administrative remedies applied to the 2009 Amendments, Plaintiffs' circumstances qualify for an exception to the exhaustion requirement.

"The exhaustion doctrine acts as a prudential rule that provides the courts 'with a method to exercise comity toward administrative agencies and to promote efficient use of judicial resources while protecting the rights of parties who have come before the court seeking relief.'" *McDonald v. Centra, Inc.*, 946 F.2d 1059, 1063 (4th Cir. 1991) (citing *Morrison-Knudsen Co., Inc. v. CHG Int'l, Inc.*, 811 F.2d 1209, 1223 (9th Cir. 1987)). However, there are exceptions to the requirement that parties exhaust administrative remedies before seeking judicial review. Exceptions to the doctrine exist where "(1) the dispute is a matter of statutory construction; (2) the utilization of administrative procedures would cause irreparable injury; and (3) the resort to administrative procedures would be

futile." *Id.* "Absent a clear showing that an administrative agency has taken a hard and fast position that makes an adverse ruling a certainty, a litigant's prognostication that he is likely to fail before an agency is not a sufficient reason to excuse the lack of exhaustion." *Thetford Properties IV Ltd. Partnership v. U.S. Dep't of Housing & Urban Dev.*, 907 F.2d 445, 450 (4th Cir. 1990).

As demonstrated above, Defendants have an established record of prohibiting floating on the Headwaters. They have represented to this court that there will be at least some degree of prohibition against floating on the Headwaters in the future. Plaintiffs are opposed to any level of floating bans on the Headwaters. Therefore, it is almost a certainty that Plaintiffs will fail in pursuing the relief they request before the agency. In this matter, requiring the exhaustion of administrative remedies would be futile.

Accordingly, the court will not dismiss Plaintiffs' claims for failure to exhaust administrative remedies.

### C.  Statute of Limitations

Aside from Plaintiffs' alleged  failure to properly challenge the 2009 Amendments through the administrative appeals process, Defendants further contend that Plaintiffs have not challenged the regulations and actions prohibiting floating on the Upper Chattooga, either 36 C.F.R. § 261.77[4] or the 1985 Plan, within the established statute of limitations. Defendants particularly argue that Plaintiffs' Complaint mounts, at most, only a facial challenge to the agency actions and that Plaintiffs' attempt to couch their Complaint in broader terms of a constitutional claim does not convert the impermissible facial challenge into a viable one.

---

[4]This regulation was promulgated in 1978 and officially prohibited all floating on the Chattooga except where allowed by permit issued by the USFS.

A general six-year statute of limitations applies to "every civil action commenced against the United States." 28 U.S.C. § 2401(a) (2009). A challenge to a procedural violation in the adoption of a regulation or other agency action must be brought within six years of the decision. Similarly, a facial challenge to the regulation or action must also be brought within six years of the decision. *Wind River Mining Corp. v. United States*, 946 F.2d 710, 712 (9th Cir. 1991).

However, a party may contest the substance of an agency decision as exceeding constitutional or statutory authority later than six years following an agency decision by filing a complaint for review of the adverse application of the decision to the party. *Id*.

> As applied to rules and regulations, the statutory time limit restricting judicial review of [agency] action is applicable only to cut off review directly from the order promulgating a rule. It does not foreclose subsequent examination of a rule where properly brought before this court for review of further [agency] action applying it. For unlike ordinary adjudicative orders, administrative rules and regulations are capable of continuing application; limiting the right of review of the underlying rule would effectively deny many parties ultimately affected by a rule an opportunity to question its validity.

*NLRB Union v. Federal Labor Relations Authority*, 834 F.2d 191, 195-96 (D.C. Cir. 1987) (quoting *Functional Music, Inc. v. Fed. Commc'n Comm'n*, 274 F.2d 543, 546 (D.C. Cir. 1958), *cert. denied*, 361 U.S. 813 (1959). A party may also obtain judicial review of a regulation outside of the statutory time limitation by petitioning the agency for amendment or rescission of the applicable regulation and then appealing the agency's decision regarding the petition.[5] *Id*. at 196.

---

[5]Certain Plaintiffs appeared to originally follow the course of action suggested by this latter method of obtaining judicial review by requesting an amendment to the 1985 Plan. That request resulted in the implementation of the 2004 Plan which continued the ban. Instead of appealing the agency decision denying the request to modify the 1985 Plan, those plaintiffs only pursued judicial review of the agency Reviewing Officer's decision to replace portions of the 2004 Plan with an interim management directive. *See American Whitewater, et al v. Bosworth, et al*, C.A. No. 2:06-cv-00074-WCO (N.D. Ga. Oct. 6, 2006) (dismissing plaintiffs' case as premature and noting possible statute of limitations issues). No appeal was taken from the district court's order; therefore, review of Plaintiffs' petitions to amend the 1985 Plan has been waived.

While Plaintiffs have missed the opportunity to make facial challenges to 36 C.F.R. 261.77 and the 1985 Plan, they are within the statutory time frame to challenge the 2009 Amendments to the 2004 Plan. Notwithstanding their ability to facially challenge the Headwaters' floating prohibition through the 2009 Amendments, Plaintiffs may also bring an "as applied" challenge to the regulations. Although worded broadly, the Complaint in this case achieves that task. The claims articulated in the Complaint challenging the regulations and actions prohibiting floating on the Headwaters stem, not merely from abstract disagreement with the policies, but from the direct application of those policies in a way that has burdened and continues to burden Plaintiffs' specific rights to currently enjoy the benefits of the Upper Chattooga. Particularly, the Complaint alleges, *inter alia*, that members of AW, the Georgia Canoeing Association, and Mr. Bruce Hare are presently prohibited from floating on the Headwaters. *See* Complaint at ¶¶ 11, 18, and 37. As additional support for their "as applied" challenge and in rebuttal of Defendants' statute of limitations argument during the hearing, Plaintiffs submitted correspondence wherein AW sought a special use permit to float on the Headwaters and was denied such permit based on the existing agency rules and regulations. *See* Pl. Ex. 15 and 16.[6]

---

[6]Defendants filed their Motion by Government Defendants to Exclude Some of the Plaintiffs' Proposed Exhibits and Witnesses [Doc. # 84] one day prior to the hearing on the motions addressed in this order. At the beginning of the hearing, the parties informed the court that they had resolved the evidentiary matters at issue in the motion and there was no need for the court to rule upon the motion. However, Plaintiffs reserved the right to introduce certain evidence depending on the nature of the arguments developed during the hearing. After Defendants presented arguments to the court asserting that Plaintiffs' claims were barred by the statute of limitations, Plaintiffs sought to introduce Plaintiffs' Exhibits 15 and 16, which consist of correspondence from AW requesting a special use permit to float on the Headwaters and the USDA's correspondence denying the same. Plaintiffs contend that these exhibits were introduced in rebuttal of Defendants' statute of limitations argument. Defendants and Intervenors objected to the admission of Plaintiffs' Exhibits 15 and 16 at the hearing arguing, in large part, that the exhibits should be disallowed because they were not part of the administrative record below and that Plaintiffs impermissively submitted them for the court's

Because the court finds that Plaintiffs' challenge to the 2009 Amendments is not moot, Plaintiffs are within the statute of limitations to make a facial challenge to the USFS actions related to the floating prohibitions. Plaintiffs also have made a sufficient "as applied" challenge to the subject regulations. Therefore, their Complaint also withstands Defendants' statute of limitations argument on this ground.

## II.     Intervenors' Motion to Dismiss

Intervenors moved to dismiss Plaintiffs' Complaint pursuant to the provisions of Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure. Intervenors substantially adopted Defendants' position as to dismissal under Rule 12(b)(1) and also stated that, even if the Motion to Dismiss was not granted under that rule, it should be granted pursuant to Rule 12(b)(6), concerning the portion of the Complaint that seeks relief regarding that section of the Chattooga River that flows through the private property of the Intervenors.

As to Intervenors' Rule 12(b)(1) argument, it is denied for the same reasons as set forth above in Part I, *supra*.

---

review of an "as applied" challenge to the regulation that does not appear in the Complaint. The court allowed Plaintiffs to make their rebuttal argument using the exhibits, but reserved the ruling on admissibility pending further review. "A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules." *United States v. Abel*, 469 U.S. 45, 54 (1984). The preliminary injunction procedure is generally less formal than a trial on the merits and often encompasses a more lenient view of evidentiary matters. *American Angus Ass'n v. Sysco Corp.*, 829 F. Supp. 807, 816 (D.C.N.C. 1992) (citing *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). The court is allowed some latitude to determine relevant evidence where necessary to prevent irreparable harm. *Id*. (citing 11 C. Wright & A. Miller, *Federal Practice & Procedure*, § 2949). Therefore, the court now admits Plaintiffs' Exhibits 15 and 16 on the grounds that they are relevant to the court's analysis of the statute of limitations issue and its determination of whether injunctive relief is justified in this matter.

In regard to Intervenors' alternative argument that Plaintiffs' Complaint should be dismissed as it would apply to the section of the river flowing through Intervenors' property, the court also declines to dismiss the Complaint on this basis. Plaintiffs conceded that they seek no injunctive relief which will affect Intervenors' private property adjacent to the river. However, both parties vigorously dispute whether the property over which the river actually flows is private property. The dispute turns on the determination of navigability. The Supreme Court has held that navigability "involve[s] questions of law inseparable from the particular facts to which they are applied," and navigability of a particular river "is, of course, a factual question." *United States v. Appalachian Electric Power Co.,* 311 U.S. 377, 404-05 (1940); *see also New York State Dept. of Envtl. Conservation v. Fed. Energy Reg. Comm'n*, 954 F.2d 56, 60 (2nd Cir. 1992).

Because there are unresolved issues of fact regarding the navigability of the river, it is not appropriate to dismiss Plaintiffs' Complaint concerning this portion of the Chattooga at this stage in the litigation.

### III.    Plaintiffs' Motion for Reconsideration of TRO; Plaintiffs' Motion for Preliminary Injunction

The parties agreed at the hearing on these motions that Plaintiffs' Motion for Reconsideration of the TRO was effectively collapsed into Plaintiffs' Motion for Preliminary Injunction. Therefore, the court will not render any separate order on Plaintiffs' request for reconsideration. Instead, the court will move forward with its determination of the prudence of issuing a preliminary injunction in this case.

 "A preliminary injunction is an 'extraordinary remed[y] involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances.'" *MicroStrategy Inc.*

*v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001); *see also Real Truth About Obama, Inc. v. Fed. Election Comm'n* , 575 F.3d 342, 345 (4th Cir. 2009), *vacated by* 103 S. Ct. 2371 (April 26, 2010), *reinstated in relevant part by* 607 F.3d 355 (4th Cir. June 8, 2010). Generally, the goal of a preliminary injunction is to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit, ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003). In contrast, mandatory preliminary injunctions compel action and, typically, do not preserve the status quo. Therefore, mandatory preliminary injunctions should be sparingly exercised and granted "only in those circumstances when the exigencies of the situation demand such relief." *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980). "[A] mandatory preliminary injunction must be necessary both to protect against irreparable harm in a deteriorating circumstance created by the defendant and to preserve the court's ability to enter ultimate relief on the merits of the same kind." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d at 526.

To determine whether a plaintiff is entitled to a preliminary injunction, the plaintiff must demonstrate "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 129 S. Ct. 365, 374 (2008). *"*[A]ll four requirements must be satisfied." *Real Truth About Obama, Inc.*, 575 F.3d at 346; *see also Winter*, 129 S. Ct. at 376.

## A.  Injunctive Relief Against Defendants

Plaintiffs request that the court enjoin "Defendants from enforcing any of their Headwaters floating prohibitions" and order "Defendants to withdraw or remove any portions of the Revised

Land and Resource Management Plans for each of the Sumter, Nantahala, and Chattahoochee National Forests that implement a ban of any kind on floating the Chattooga." Pl. Memo. in Supp. of Preliminary Injunction, at 3.

The regulations promulgating the floating prohibitions at issue have been in place for more than thirty (30) years. Therefore, the requests by Plaintiffs do not seek to maintain the status quo, but are requests for mandatory preliminary injunctive relief. Accordingly, the court must be more scrutinizing in its determination of whether mandatory relief is warranted. *In re Microsoft Antitrust Litig.*, 333 F.3d at 525.

### 1. Success on the Merits

Plaintiffs contend that they are entitled to injunctive relief against Defendants because they can demonstrate that they are likely to succeed on the merits. Because a preliminary injunction grants relief on a temporary basis prior to trial, the party seeking the preliminary injunction must demonstrate that it is likely to succeed on the merits at trial by "a clear showing" and may not rest on merely the probability of success. *Real Truth About Obama, Inc.,* 575 F.3d at 345 (citing *Winter v. Nat'l Res. Def. Council, Inc.*, 129 S. Ct. 365, 376 (2008)), *vacated by* 103 S. Ct. 2371 (April 26, 2010), *reinstated in relevant part by* 607 F.3d 355 (4th Cir. June 8, 2010).

Plaintiffs allege that Defendants' actions are in direct contravention of the statutes governing the agencies and the resources they are empowered to protect. Specifically, Plaintiffs note that the WSRA directs Defendants "to protect and enhance the values which caused it to be included in said system without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values." *See* 16 U.S.C. § 1281(a). Plaintiffs further note that floating is one of the outstanding remarkable values ("ORV") that caused the

20

Chattooga, particularly the Headwaters, to be designated as a wild and scenic river. *See generally*, 1971 Study. Therefore, Plaintiffs contend Defendants' institution of a complete prohibition against floating on the Headwaters is a direct violation of the statutory mandate demonstrating that Plaintiffs are likely to prevail on the merits.

Conversely, Defendants argue that its decisions regarding floating on the Headwaters are nothing more than necessary regulation to balance the many uses and ORVs for which the Chattooga was designated as wild and scenic. The other uses and ORVs include hiking, hunting, fishing, and camping. In this way, Defendants claim to fulfill the very essence of the requirements under the statute - that is to protect and enhance all values, not just one value.

In making this determination, the court notes that floating is one of the ORVs of the Chattooga, but it cannot overlook the many other values which caused the river to be included in the Act. Indeed, the WRSA contemplates that some level of regulation is necessary to balance the river's ORVs. By the same token, the court does not take lightly the agency's own Reviewing Officer's assessment revealing some of the flaws in the previous ban contained within the 2004 Plan. Additionally, the agency has submitted little support for the ban contained in the 1985 Plan and has admittedly withdrawn the 2009 Amendments due to irregularities. Based on the agency's past inability to substantiate the reasons for wholly banning floating on the Headwaters, Plaintiffs may have some chance of success on the merits. However, at this stage of the proceedings, Plaintiffs have not met the heightened burden required to sanction mandatory relief.

### 2. Irreparrable Harm

Plaintiffs also claim that they will suffer irreparable harm without the issuance of injunctive relief. Plaintiffs seeking injunctive relief must demonstrate that irreparable harm is likely in the

absence of an injunction, not merely speculative. *Winter*, 129 S. Ct. at 376. Plaintiffs seeking injunctive relief must do more than establish the "'possibility' of irreparable harm." *Id.* at 375. Instead, the "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate injury is *likely* in the absence of an injunction." *Id*. (emphasis supplied) (citing *Los Angeles v. Lyons,* 461 U.S. 95, 103 (1983)); *see also Real Truth About Obama, Inc.*, 575 F.3d at 346-48 (holding that the preliminary injunction standard articulated in *Winter* has overruled the Fourth Circuit's previous standard for preliminary injunctions found in *Blackwelder Furniture Co. v. Selig Mfg. Co.*, 550 F.2d 189 (4th Cir. 1977)). The harm to be prevented must be of an immediate nature and not simply a remote possibility. *In re Microsoft Antitrust Litig.*, 333 F.3d at 527.

The primary source of harm alleged by Plaintiffs is the loss of opportunities to experience floating on the Headwaters of the Chattooga. In particular, Plaintiff Hare testified that he had enjoyed experiences in the very waters at issue as a child, and now, is denied that experience day after day, with little hope that he will be able to float on the Headwaters again. However, he also agreed with Defendants that the water levels of the Chattooga naturally limit floating on the Headwaters to very few days during any given year. Although Hare presented moving testimony, the fact that he and others will not have imminently unfettered access to the Headwaters is not the type of immediate and irreparable harm which merits the imposition of a mandatory preliminary injunction.

Plaintiffs' claim of injury is incompatible with those cases cited to this court in support of their position. Most notably, Plaintiffs cited *Sierra Club v. Martin,* 933 F. Supp. 1559 (N.D. Ga. 1996), *rev'd on other grounds by Sierra Club v. Martin*, 110 F.3d 1551 (11th Cir. 1997), wherein that court considered the issuance of a preliminary injunction to stop a timber project which would

have caused the death of thousands of migratory birds. In *Martin*, the plaintiffs presented the court with clear evidence of the number of deaths that would occur without court intervention. *Id.* at 1565. Plaintiffs also cited *Fund for Animals v. Espy*, 814 F. Supp. 142, 151 (D.D.C. 1993). The *Espy* court addressed a request for an injunction against the capture of pregnant bison near Yellowstone National Park for a scientific experiment in which the bison would be infected with bacteria and later forced to endure abortions. There, the plaintiffs alleged irreparable injury to the aesthetic interest of viewing the bison "and the prospect of viewing the less than humane baiting and capturing of the bison with the knowledge of their destination and fate." *Id.* While these cases may involve concerns for a natural resource, the immediate and urgent nature of the irreparable injuries displayed in the cases cited by Plaintiffs is not exhibited in the instant case.

The United States District Court for the District of the Virgin Islands has examined a case which concerned only a lost opportunity to experience a resource. *See Rivera v. United States,* 910 F. Supp. 239 (D.V.I. 1996). In *Rivera*, the plaintiffs brought suit against the United States government concerning the closing of a public island beach due to a partial government shutdown caused by a budget dispute. The plaintiffs sought an injunction prohibiting the government from closing the island beach to the public. *Id.* The beach was included as public land for recreation and enjoyment by presidential proclamation. The proclamation provided, in part, that:

> Provided, that neither the Department of the Interior, nor any other agency or instrumentality of the United States, shall adopt or attempt to enforce any rule, regulation or requirement limiting, restricting or reducing the existing fishing (including the landing of boats and the laying of fishpots outside the marine garden), bathing or recreational privileges by inhabitants of the Virgin Islands, or charge any fees for admission to the area.

Proclamation No. 3443, reprinted in 1962 U.S.C.C.A.N. 4169-70. In addition to the clear violation

of the presidential proclamation, the district court found that the plaintiffs' loss of enjoyment of the use of the beach was an irreparable hardship and "not a mere inconvenience that this Court should treat as de minimis." *Rivera*, 910 F. Supp. at 243.

The instant case is patently distinguishable from *Rivera*. The *Rivera* court was presented with a request for a prohibitory injunction to preserve the status quo. Here, Plaintiffs petition the court for mandatory injunctive relief, asking the court to disrupt the status quo of Defendants' decades-long regulation of the Chattooga and potentially cede from other users' enjoyment which may rightfully belong to them. Understandably, Plaintiffs are disappointed in not being able to freely access this portion of the river as they would like. However, Plaintiffs are not denied total use of a natural resource as was the case in *Rivera*. Plaintiffs have access to the Chattooga River to experience floating on the lower portion of the river and experience different ORVs in other areas. Unlike the cases cited above, Plaintiffs present this court with only a partial loss of opportunity to participate in one particular activity. Plaintiffs are not being denied the opportunity to enjoy the resource on a wholesale basis in this case and the loss of opportunity claimed is one that will recur, absent harm to the natural resource, once the merits of the matter are determined.

This court remains concerned about whether Defendants have properly exercised its regulatory authority to wholly prohibit floating on the Headwaters. However, Defendants' limitation of one use within an isolated section of the river does not rise to the level of harm required to warrant the imposition of a mandatory injunction - particularly where it is unclear whether Plaintiffs are likely to succeed on the merits.

### 3. Balance of Hardships

The third factor the court must consider is whether a preliminary injunction is justified

considering the balance of hardships between the litigants. In making this determination, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 129 S. Ct. at 376 (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)).

Plaintiffs claim that, without preliminary relief, they will continue to be wholly prohibited from floating on the Headwaters for an indeterminate amount of time subject only to the discretion and whim of Defendants. Defendants, on the other hand, argue that completely lifting its regulations or imposing different regulations concerning floating on the Headwaters would lead to more difficulty in implementation of balancing all uses by the agency and will likely disrupt existing uses. Both sides submit persuasive arguments on this factor. However, because injunctive relief in favor of Plaintiffs would have a sweeping effect on all users of the Headwaters, in addition to Defendants, the court finds that the balance of the hardships disfavor Plaintiffs in this case.

### 4. Public Interests

The final factor that must be considered in determining the propriety of a preliminary injunction is whether such an injunction would be in the public interest. Similar to the balance of hardships between the parties, the public interest factor seeks to evaluate the impact of the issuance of injunctive relief relative to the interest of the public at large. *See* 11 A. Wright & A. Miller, *Federal Practice & Procedure*, § 2948.4. The court "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 129 S. Ct. at 377. As mentioned above, the impact of injunctive relief could potentially affect multiple classes of users and other recreational uses on the Headwaters of the Chattooga. Balancing the ORVs is an important goal of the WSRA, and the charge of overseeing that balance has been delegated to Defendants. It

is not in the public interest to remove all regulation against floating on the Headwaters without a further hearing on the merits to determine whether Defendants have appropriately discharged their statutory obligations.

Consequently, the court denies Plaintiffs' request for preliminary injunctive relief against Defendants.

### B. Injunctive Relief Against Intervenors

Intervenors contend that, even if injunctive relief is warranted against Defendants, such relief is not appropriate as to Intervenors.

First, it is not clear that Plaintiffs would prevail on the merits regarding this portion of the Chattooga. The parties strongly contest the navigability of the waters; and therefore, the issues as to whether or not this portion of the Chattooga is private property remains unresolved at this point in the litigation. The section of the Chattooga which crosses the Intervenors' property only spans approximately two miles and the balance of equities and public interest tip in favor of the private landowner here. Although it is well established that the United States has the power to regulate conduct on non-federal land when necessary to protect adjacent federal property, *see U.S. v. Lindsey*, 595 F.2d. 5, 6 (9th Cir. 1979), the courts also have a strong interest in protecting private property. *See* U.S.C.A. Const. Amend. V. Therefore, injunctive relief as to the section of the Chattooga which crosses the Intervenors' property is not appropriate at this time.

Accordingly, the court denies any preliminary injunctive relief to Plaintiffs as to the section of the River abutting Intervenors' property.

### CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss [Doc. # 44] and Intervenors'

Amended Motion to Dismiss [Doc. # 69] are **DENIED**. Plaintiffs' Motion for Preliminary Injunction [Doc. # 15] and Plaintiffs' related Motion for Reconsideration of Temporary Restraining Order [Doc. # 35] are also **DENIED**. Motion by Government Defendants to Exclude Some of the Plaintiffs' Proposed Exhibits and Witnesses [Doc. # 84] is **GRANTED IN PART, AND DENIED IN PART** to the extent that Plaintiffs' Exhibits 15 and 16 are admitted as indicated herein. It is further ordered that Defendants answer Plaintiffs' Complaint within thirty (30) days from the date of this Order.

      **IT IS SO ORDERED.**

s/ J. Michelle Childs<br>
United States District Judge

Greenville, South Carolina
December 2, 2010